UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Computershare Trust Company, National Association, as Trustee for the Certificateholders of BBCMS Mortgage Trust 2023-C19, Commercial Mortgage Pass-Through Certificates, Series 2023-C19, acting by and through K-Star, as Special Servicer,**<br><br>Plaintiff,<br><br>-against-<br><br>**Starwood Mortgage Capital LLC,**<br><br>Defendant. | Case No. 26-1695<br><br>**COMPLAINT** |

Plaintiff Computershare Trust Company, National Association,[1] as Trustee for the "Certificateholders" of BBCMS Mortgage Trust 2023-C19, Commercial Mortgage Pass-Through Certificates, Series 2023-C19 (the "Trust" or "Plaintiff"), acting by and through K-Star Asset Management LLC ("Special Servicer"), as Special Servicer, files this Complaint against Defendant Starwood Mortgage Capital LLC ("Starwood" or "Seller") and alleges as follows:

**SUMMARY OF THE ACTION**

1. This is a breach of contract action against Starwood, which originated and then sold a commercial loan (the "Loan") collateralized by real property that houses a mixed-use 9-story brick building with a parking garage underneath (the "Building") and a separate adjacent parking garage (the "Parking Garage," and together with the Building and all related real property, the

---

[1] Capitalized terms have the meanings set forth herein or in the underlying agreements discussed below.

1

"Property").[2] When Plaintiff purchased the Loan, Seller made representations and warranties (the "R&Ws" or "Representations and Warranties" and each "R&W" or "Representation and Warranty") concerning, among other things, the absence of any material damage to the Property (the "No Material Damage R&W").

2.      That R&W was false. Even before Plaintiff purchased the Loan, the Parking Garage had significant structural defects that ultimately rendered it unusable.

3.      Because the No Material Damage R&W was false, Plaintiff asked Seller to repurchase the Loan or otherwise cure the defects—the express contractual remedies for breach of an R&W. Seller has refused, claiming that the No Material Damage R&W does not apply to the Parking Garage parcel because it was intended to be released and therefore was not part of the collateral for the loan. In fact, the relevant agreements specifically provide that the Parking Garage parcel is part of the collateral and that the repurchase remedy applies to it until and unless it has actually been released from the security agreement—which never occurred here.

4.      Accordingly, and as set forth more fully below, Plaintiff brings this action for breach of contract seeking an order requiring Seller to repurchase the Loan at the contractually mandated Purchase Price pursuant to MLPA Section 5(a) and PSA Section 2.03(b).

## THE PARTIES AND ASSOCIATED ENTITIES

5.      Plaintiff Trust is a national banking association with its principal place of business in Massachusetts. Plaintiff is the Trust for a commercial mortgage-backed securities ("CMBS") transaction pursuant to that certain Pooling and Servicing Agreement (the "PSA"), dated as of April 1, 2023, by and among Barclays Commercial Mortgage Securities LLC ("Depositor"),

---

[2] The PSA and MLPA define the Property as the "Mortgaged Property."

KeyBank National Association ("Master Servicer"), Special Servicer, Pentalpha Surveillance LLC ("Operating Advisor" and "Asset Representations Reviewer"), and Trustee.

6. The Trust acts by and through non-party Special Servicer for the Trust under the PSA. Pursuant to the PSA, Special Servicer is empowered to bring this action for and on behalf of the Trust to enforce its rights and remedies under the operative agreements. Special Servicer also acts pursuant to that certain Limited Power of Attorney dated as of April 28, 2023.

7. Defendant Seller is a Delaware limited liability company with its principal place of business in Florida. Seller entered into that certain Mortgage Loan Purchase Agreement (the "MLPA"), dated April 27, 2023, with the non-party Depositor (known as "Purchaser" in the MLPA), which bought the Loan from Seller and then deposited the Loan into the Trust.

## VENUE AND JURISDICTION

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity exists because Plaintiff and Seller are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Pursuant to N.Y. Gen. Oblig. Law § 5-1402, this Court has personal jurisdiction over Seller because Section 14 of the MLPA designates New York as the choice of law, the MLPA is in consideration of not less than $1 million, and Section 14 of the MLPA provides that "each of the parties hereto hereby irrevocably (i) submits to the jurisdiction of any New York State and federal courts sitting in the Borough of Manhattan in New York City with respect to matters arising out of or relating to this Agreement." In addition, this Court may exercise personal jurisdiction over Seller pursuant to N.Y. C.P.L.R. § 302(a)(1) because Seller transacts business in the State of New York. Under Fed. R. Civ. P. 4(k)(1)(A), this Court may exercise personal jurisdiction over

Seller because Seller has been served or will be served a summons, and Seller is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."

10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Seller resides in the Southern District of New York (the "District") for venue purposes based on its contacts with the District as set forth in the preceding paragraph, and because the MLPA provides that "each of the parties hereto hereby irrevocably . . . (ii) agrees that all claims with respect to any action or proceeding regarding such matters may be heard and determined in such New York State or federal courts; [and] (iii) waives, to the fullest possible extent, with respect to such courts, the defense of an inconvenient forum."

## CMBS TRANSACTIONS GENERALLY

11. A CMBS transaction is a structured finance transaction that is designed to pool multiple commercial mortgage loans together as part of a single Trust, so that the Trust can issue certificates allowing investors (known as certificateholders) to purchase ownership interests (known as certificates) in the pool of loans in the Trust. Cash flows generated by borrowers' payments on the underlying mortgage loans are used to pay the certificateholders, and thus the mortgage loans essentially collateralize the certificates the Trust issues to investors.

12. CMBS transactions allow lenders to reduce risk by securitizing loans and transferring credit risk to investors, while providing investors with the opportunity to invest in a diversified portfolio of commercial real estate loans.

13. The key agreements in a CMBS transaction are the mortgage loan purchase agreement and the pooling and servicing agreement.

14. In the mortgage loan purchase agreement, underlying commercial loans are purchased from an originating or selling institution. The loans are typically purchased in the first

instance by a "depositor," who then transfers the loans to the trust pursuant to the pooling and servicing agreement. Thus, the depositor is only an intermediary between the loan originator (who sells the mortgage loans) and the trust in which the mortgage loan is being pooled.

15. The pooling and servicing agreement governs the other relationships between the major participants in each CMBS transaction—the trust, trustee, master servicer, special servicer, depositor, and certificateholders.

    A. The depositor transfers the loans to the trust.

    B. The trustee holds the loans in trust on behalf of the certificateholders and has certain administrative responsibilities with respect to the trust (such as reporting), but it delegates most loan-level matters to the master servicer and special servicer.

    C. The certificateholders purchase certificates issued by the trust, which give them certain rights with respect to distributions from the trust and otherwise.

    D. The master servicer services the loans while they are performing, collecting payments on the loans and distributing payments to the certificateholders.

    E. The special servicer is responsible for servicing defaulted loans, including negotiating with borrowers, entering into loan modifications, pursuing foreclosure, or as is relevant in the circumstances here, enforcing the trust's rights against the mortgage loan seller.

## THE LOAN AND COLLATERAL

16. On or about March 8, 2023, before the Trust was established, Starwood made the Loan to the non-party borrower in the original principal amount of $54.5 million. The Loan is evidenced by, inter alia, (a) a Loan Agreement dated as of March 8, 2023, by and between Seller, as lender, and Fort Lee Office LLC ("Borrower"), as borrower (the "Loan Agreement"), and (b) a

Promissory Note dated as of March 8, 2023, in the original principal amount of $54,500,000 executed by Borrower in favor of Seller. Borrower's obligations under the terms of the Loan are secured by, among other things, a Mortgage, Assignment of Leases and Rents and Security Agreement dated as of March 8, 2023 (the "Security Instrument") on the Property.

17. The Security Instrument created a security interest in the "Property" which the Security Instrument defined as all of the "real, personal, tangible and intangible property, rights, interests and estate" in certain Land, Improvements, easements, equipment, fixtures, personal, property, leases and rents, and other customary rights and interests. (Security Instrument, §1.1.)

18. The Land is defined in the Security Instrument as "[t]he real property described in Exhibit 'A'" which was attached thereto. Exhibit A contains a legal description of the Land, which is the location of two parcels of real property: (a) one with a nine (9) story 292,000 square foot brick mixed-use building that contains commercial office and retail suites on floors one through five, residential apartment units on floors six through nine, and a parking garage underneath (the "Building"); and (b) a separate 8-story parking garage ("Parking Garage") adjacent to the Building that is separate from the parking underneath the Building. (*See* survey dated December 6, 2022 (the "Survey") and appraisal dated March 15, 2023 which were provided by Seller to Purchaser in connection with the Closing.) The address of the Building is 2 Executive Drive in Fort Lee, NJ.

19. The Loan Agreement defines the "Property" as "each parcel of real property, the Improvements thereon and all Personal Property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clause of the Security Instrument and referred to therein as the 'Property.'" (Loan Agreement, §1.1.)

20.　　The "Release Parcel" is defined in the Loan Agreement as "that portion of the Property denoted on Exhibit 'B' attached hereto."  Exhibit B contains a site plan of the entire Property with the portion constituting the Release Parcel clearly marked.  The Release Parcel contains the Parking Garage.

21.　　The parcel containing the Parking Garage was denominated the Release Parcel because, under Section 2.6.3 of the Loan Agreement, the parties agreed that the Release Parcel could subsequently be released from the collateral, upon satisfaction of certain conditions.

## THE PSA

22.　　On April 1, 2023, several weeks after the origination of the Loan, a non-party depositor, Trustee, a non-party master servicer, the non-party Special Servicer, and a non-party operating advisor entered into the PSA for the CMBS Trust at issue in this case.

23.　　Pursuant to Section 2.01 of the PSA, Depositor agreed to "assign, sell, transfer and convey to the Trustee, in trust, without recourse, for the benefit of the Certificateholders and the Trustee (as holder of the Lower-Tier Regular Interests) all the right, title and interest of the Depositor" in each Mortgage Loan (including the Loan).

24.　　The PSA's definition of "Mortgaged Property" is "[t]he real property subject to the lien of a Mortgage."  (PSA, §1.1.)  The MLPA incorporates the PSA's definitions.  (MLPA at 1.)  The Mortgaged Property and Property secure Borrower's obligations under the Security Instrument.  (Security Instrument, §1.1.)

25.　　Under Section 2.03(f) of the PSA, Special Servicer "shall, for the benefit of the Certificateholders and the Trustee (as holder of the Lower-Tier Regular Interests), enforce the obligations of the applicable Mortgage Loan Seller under the Mortgage Loan Purchase Agreement . . . ."

26. Under Section 3.01(b) of the PSA, Special Servicer "shall have full power and authority . . . to do or cause to be done any and all things in connection with such servicing and administration for which it is responsible which it may deem necessary or desirable."

## THE MLPA

27. On April 27, 2023 (the "Closing Date"), Seller and Depositor entered into the MLPA. Pursuant to Section 1 of the MLPA, Seller agreed to "sell, assign, transfer, set over and otherwise convey to the Purchaser, without recourse, representation or warranty, other than as set forth herein," two commercial mortgage loans (the "Mortgage Loans"), one of which was the Loan. The other Mortgage Loan is not at issue here.

28. As of the Cut-off Date (April 6, 2023), the Loan had an aggregate principal balance of $54,500,000. (*Id.*)

29. The Depositor's conveyance of the Mortgage Loans to the Trustee on behalf of the Trust occurred on April 27, 2023, concurrently with the Depositor's purchase of the Loan from Seller under the MLPA. (PSA §2.01(a); MLPA §1.)

## SELLER'S REPRESENTATIONS AND WARRANTIES

30. In the MLPA, as is typical in securitization transactions, Seller made certain Representations and Warranties regarding the Loans for the benefit of Purchaser.

31. These Representations and Warranties relate to, *inter alia*, the loan origination, the physical condition of the mortgaged property securing the Loan, and the default status of the Loan as of the Closing Date.

32. The relevant R&W here is the No Material Damage R&W, which states as follows:

> The Mortgage Loan Seller or the originator of the Mortgage Loan inspected or caused to be inspected each related Mortgaged Property within six

months of origination of the Mortgage Loan and within twelve months of the Cut-off Date.

An engineering report or property condition assessment was prepared in connection with the origination of each Mortgage Loan no more than twelve months prior to the Cut-off Date. To the Mortgage Loan Seller's knowledge, based solely upon due diligence customarily performed in connection with the origination of comparable mortgage loans, as of the Closing Date, each related Mortgaged Property was free and clear of any material damage (other than (i) deferred maintenance for which escrows were established at origination and (ii) any damage fully covered by insurance) that would affect materially and adversely the use or value of such Mortgaged Property as security for the Mortgage Loan.

(MLPA, Ex. C, §11.)

33. In the MLPA, Seller retained certain obligations to cure or otherwise provide a remedy for a breach of any of those R&Ws. These obligations are a critical component of the securitization process because they facilitate and expedite investors' evaluation of the underlying loans and properties, enabling investors to properly assess and price the risk of commercial mortgage-backed securities.

34. The Certificateholders were entitled to rely upon the Representations and Warranties, both as a matter of law and in accordance with the governing contracts, regardless of whether the Certificateholders have performed their own due diligence or otherwise possess information that may be inconsistent with the warranted information. MLPA Section 3 provides:

Examination of Mortgage Loan Files and Due Diligence Review. The Mortgage Loan Seller shall reasonably cooperate with any examination of the Mortgage Files for, and any other documents and records relating to, the Mortgage Loans, that may be undertaken by or on behalf of the Purchaser on or before the Closing Date. The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of any of the Mortgage Files for, and/or any of such other documents and records relating to, the Mortgage Loans, shall not affect the Purchaser's right to pursue any remedy available in equity or at law for a breach of the Mortgage Loan Seller's representations and warranties made pursuant to Section 4, except as expressly set forth in Section 5.

9

35. Section 12 of the MLPA provides that the representations and warranties "shall remain operative and in full force and effect and shall survive delivery of the Mortgage Loans by the Mortgage Loan Seller to the Purchaser and by the Purchaser to the Trust . . . ."

### SELLER'S DUTIES WITH RESPECT TO DEFECTIVE MORTGAGE LOANS

36. Together, the PSA and the MLPA provide for remedies for a breach of the R&Ws.

37. The PSA defines a "Material Defect" as: "With respect to any Mortgage Loan, a Defect in any Mortgage File or a Breach, which Defect or Breach, as the case may be, materially and adversely affects the value of such Mortgage Loan, the value of the related Mortgaged Property or the interests of the Trustee or any Certificateholder therein or causes such Mortgage Loan to be other than a Qualified Mortgage." (PSA, §1.01.)

38. The PSA defines a "Breach" as: "With respect to any Mortgage Loan, a breach of any representation or warranty with respect to such Mortgage Loan set forth in Section 4(b) of the related Mortgage Loan Purchase Agreement." (*Id.*)

39. Section 2.03(b) of the PSA provides that "not later than ninety (90) days after . . . the applicable Mortgage Loan Seller's receipt of such notice of such Repurchase Request or, if earlier, such Mortgage Loan Seller's discovery of such Material Defect, . . . " Seller must either "(A) cure such Material Defect in all material respects, at such Mortgage Loan Seller's own expense, including reimbursement of any related reasonable additional expenses of the Trust reasonably incurred by any party to this Agreement"; "(B) repurchase the affected Mortgage Loan . . . at the applicable Purchase Price and in conformity with the applicable Mortgage Loan Purchase Agreement and this Agreement …"; or (C) "substitute a Qualified Substitute Mortgage Loan . . . for such affected Mortgage Loan or REO Loan."

10

40. With respect to any Mortgage Loan to be purchased, the "Purchase Price" is defined as a price equal to the outstanding principal balance of the Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest on the Mortgage Loan, plus various other costs and expenses. (*Id.*, §1.01, *see infra* Paragraph 73 for full text.)

41. Section 5 of the MLPA specifically provides that if the Mortgaged Property for a particular Loan consists of more than one parcel, one of which is contemplated to be released (which is the case here), Seller retains its repurchase obligations with respect to any such Release Parcel until such time as it is actually released, and other conditions are satisfied, as set forth below:

> If there is a Material Defect with respect to one or more Mortgaged Properties securing a Mortgage Loan, the Mortgage Loan Seller shall not be obligated to repurchase the Mortgage Loan if (i) the affected Mortgaged Property may be released pursuant to the terms of any partial release provisions in the related Mortgage Loan documents (and such Mortgaged Property is, in fact, released), (ii) the remaining Mortgaged Property(ies) satisfy the requirements, if any, set forth in the Mortgage Loan documents and the Mortgage Loan Seller provides an Opinion of Counsel to the effect that such release would not cause an Adverse REMIC Event and (iii) each applicable Rating Agency has provided a Rating Agency Confirmation.

42. One of the prerequisites for releasing the Release Parcel confirms the applicability of the Representations and Warranties to the Release Parcel, so long as it remains part of the Property collateralizing the Loan:

> if the Loan is included in a REMIC Trust, and in the event that, after giving effect to such release, the ratio of the unpaid principal balance of the Loan to the value of the Remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the fair market value of the Release Parcel at the time of the release; and (ii) an amount such that the loan-to-value ratio of the Loan (as so determined by Lender) does not increase after the release of the Release Parcel, unless Lender receives an opinion of counsel that if such amount is

> not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the release of the Release Parcel.

(Loan Agreement, §2.6.3(m).) Accordingly, until such time as the Release Parcel is actually released in accordance with the Loan Documents and the MLPA, it remains part of the Mortgaged Property securing the Loan and subject to the R&Ws and the repurchase remedy.

43. The Release Parcel (*i.e.*, the Parking Garage) was never released, and it remains part of the Property to this day.

## PLAINTIFF DISCOVERS DEFECTS IN THE PARKING GARAGE

44. On or about January 18, 2024, the Loan was transferred to special servicing for imminent default, which quickly turned into payment default.

45. In April 2024, Special Servicer became aware of problems with the Parking Garage as a result of a phone call from Borrower. In that call, Borrower requested that Special Servicer make a payment, which Borrower said was necessary to avoid an imminent closure of the Parking Garage.

46. Almost immediately after that phone call, on April 16, 2024, the Borough of Fort Lee, Office of the Building Department issued a notice advising as follows:

> The parking garage is in deteriorated state as there are numerous areas where holes and cracks are. I issued an unsafe structure for the garage. The parking garage will be closed by the Borough of Fort Lee on April 18, 2024 at 10:00 a.m. All cars must be removed by then and find parking elsewhere until the repairs are completed.

47. On April 18, 2024, the Parking Garage was in fact closed. The vast majority of the Parking Garage remains closed as of the date hereof.

48. After the Parking Garage was closed, Special Servicer investigated the facts surrounding the closure, and the options and potential costs to repair or replace the Parking Garage.

12

49. Special Servicer learned that, even before the Trust acquired the Loan, the Parking Garage suffered from significant structural deficiencies.

50. On or about September 1, 2021, the Chetrit Group Development and Company, an affiliate of Borrower, had issued a report stating that certain areas of the Parking Garage required "Immediate Closing" due to "critical cracks" and that the surface was "very dangerous and ready to collapse." The report also identified other areas requiring immediate shoring, stating: "Need to close entire parking lot entrance or shoring needed immediately. Some shoring has a major corrosion and needs to be replaced. Many shoring needs re-reinforced (Supporting corroding beams are not remedies, shoring shall cover and support damaged concrete slabs.) And slabs and q-decks need to be replaced immediately."

51. On April 27, 2023—the same date the MLPA was executed—the Fort Lee Building Department had inspected the Parking Garage.

52. On April 28, 2023, one day after the Closing of the MLPA, the Fort Lee Building Department had issued a "Notice of Unsafe Structure," which identified the following "unsafe condition" pursuant to New Jersey law: "Parking garage structure has numerous shored up areas along with bolted steel beam joints failing." The notice ordered that the Parking Garage be vacated by May 27, 2023. The notice further stated: "Failure to correct the unsafe condition or refusal to comply with this ORDER will result in this matter being forwarded to legal counsel for prosecution and assessment of penalties up to $2,000.00 per week per violation."

53. The unsafe condition was never corrected.

## THE DEFECTS HAD A MATERIAL ADVERSE
## EFFECT ON THE VALUE OF THE LOAN

54. The Parking Garage's structural defects, closure and extraordinary repair costs materially and adversely affected the value of the Property, significantly impaired the Property's functionality and marketability, and increased the risk of loss on the Loan.

55. The absence of adequate parking for the mixed-use building impaired the ability to lease the office space or to sell or rent the residential space.

56. On or about April 24, 2024, Special Servicer on behalf of the Trust accelerated the Loan.

57. On or about June 5, 2024, Special Servicer on behalf of the Trust commenced an action seeking to foreclose on the Property. *See Computershare Tr. Co. v. Fort Lee Office LLC*, No. F-5423-24 (N.J. Super. Ct. Ch. Div. Bergen Cty.) ("Foreclosure Action").

58. On or about July 12, 2024, in the Foreclosure Action, the court appointed a receiver to manage the Property.

59. On or about December 9, 2024, an engineering firm provided the receiver with a "condition appraisal survey" intended to "recommend options to extend the service life of the parking garage." The report estimated that the cost of a full replacement of the garage would exceed the unpaid principal balance of the Loan, and the cost of a long-term repair would be approximately one-third of the unpaid principal balance of the Loan—in either case resulting in a material adverse effect on the value of the Loan. These repair and replacement estimates further demonstrate the material and adverse effect of the defects; however, Plaintiff seeks enforcement of the contractual repurchase remedy as set forth in the MLPA and PSA.

## SELLER'S BREACH OF THE
## NO MATERIAL DAMAGE REPRESENTATION AND WARRANTY

60. After completing its investigation and determining that the defects in the Parking Garage had a material adverse effect on the value of the Loan, Special Servicer determined that the No Material Damage R&W was false.

61. First, Seller did not "inspect[] or cause[] to be inspected each related Mortgaged Property within six months of origination of the Mortgage Loan and within twelve months of the Cut-off Date," and therefore required an inspection after September 8, 2022 (six months prior to the March 8, 2023 Loan origination date). In fact, the property condition assessment for the Property, which was generated in connection with the origination of the Loan, expressly excluded the Release Parcel from its scope, notwithstanding that the Release Parcel had not been released and remained part of the Mortgaged Property.

62. Second, upon information and belief, the No Material Damage R&W was false because, "[t]o the Mortgage Loan Seller's knowledge, based solely upon due diligence customarily performed in connection with the origination of comparable mortgage loans, as of the Closing Date," the Release Parcel "was **[not]** free and clear of any material damage (other than (i) deferred maintenance for which escrows were established at origination and (ii) any damage fully covered by insurance) that would affect materially and adversely the use or value of such Mortgaged Property as security for the Mortgage Loan." To the contrary, "due diligence customarily performed in connection with the origination of comparable mortgage loans" would have identified the material structural deficiencies that the Fort Lee Building Department identified through its inspection soon thereafter.

## SELLER BREACHES ITS REPURCHASE OR CURE OBLIGATIONS

63. During this period, the Seller learned about the Parking Garage's defects, including through conversations with the Special Servicer and otherwise.

64. In those conversations, Seller claimed that the Release Parcel was not part of the Property and was not subject to the repurchase remedy set forth in the MLPA and the PSA—notwithstanding that the Release Parcel had never been released.

65. On September 26, 2025, Special Servicer delivered a formal Repurchase Request to Seller and the other parties to the PSA. That Repurchase Request described the Material Defects relating to the Parking Garage and the consequent breach of the No Material Damage R&W, and it demanded Seller comply with its obligations under Section 2.03 of the PSA and Section 5 of the MLPA.

66. On December 16, 2025, Seller sent Special Servicer a letter stating that Special Servicer's Repurchase Request was supposedly "insufficient to satisfy either the MLPA's notice requirements or the PSA's requirements for a Repurchase Request and as a result, fails to constitute valid notice of any breach," and on that ground, Seller declared Special Servicer's Repurchase Request "a legal nullity," and this matter to be closed."

67. However, Special Servicer's Repurchase Request was valid and sufficient under Section 2.03(k)(ii) and complied with the PSA and the MLPA.

68. In any event, the MLPA provides that Seller's discovery of the Material Defect also gave rise to the Seller's repurchase obligation, and further that a delay in providing notice shall not relieve Seller of its obligation absent narrow exceptions not applicable here.

69. Seller's December 16, 2025 letter also suggested, consistent with Seller's previous arguments, that "any issues impacting the parking garage" would not be a breach of any R&W

16

because the Parking Garage "was intended to be released from the Loan collateral and assigned zero value at origination . . . ."

70. As set forth above, this argument ignores the express provisions of the MLPA and the Loan Agreement, pursuant to which the Parking Garage had not been released from the collateral and therefore was still subject to the repurchase remedy for a breach of an R&W.

71. Because the Seller has refused to remedy the material breach within 90 days of discovery or notice of the breach, the Seller has breached its repurchase, cure or substitution obligations under the MLPA and the PSA.

## THE TRUST'S DAMAGES

72. As noted above, under Section 5 of the MLPA, Seller is obligated to cure any Material Defect, "including reimbursement of any related reasonable additional expenses of the Trust reasonably incurred by any party to the Pooling and Servicing Agreement," or "repurchase the affected Mortgage Loan . . . at the Applicable Purchase Price . . . ," or "substitute a Qualified Substitute Mortgage Loan . . . ."

73. "Purchase Price" is defined as, with respect to any Mortgage Loan to be purchased by Seller pursuant to Section 5 of the MLPA, a price equal to:

> (i) the outstanding principal balance of such Mortgage Loan as of the date of purchase; plus
>
> (ii) all accrued and unpaid interest on the Mortgage Loan at the related Mortgage Rate in effect from time to time (excluding any portion of such interest that represents Default Interest or Excess Interest), to, but not including, the Due Date therefor immediately preceding or coinciding with the Determination Date for the Collection Period of purchase; plus
>
> (iii) all related unreimbursed Servicing Advances plus accrued and unpaid interest on all related Advances at the Reimbursement Rate, Special Servicing Fees (whether paid or unpaid) and any other additional trust fund expenses (except for Liquidation Fees) in respect of such Mortgage Loan, if any; plus

17

(iv) if such Mortgage Loan is being repurchased or substituted by the related Mortgage Loan Seller pursuant to Section 5 of the applicable Mortgage Loan Purchase Agreement, all reasonable out-of-pocket expenses reasonably incurred or to be incurred by the Master Servicer, the Special Servicer, the Depositor, the Certificate Administrator or the Trustee in respect of the omission, breach or defect giving rise to the repurchase or substitution obligation, including any Asset Representations Reviewer Asset Review Fee to the extent not previously paid by the related Mortgage Loan Seller and any expenses arising out of the enforcement of the repurchase or substitution obligation, including, without limitation, legal fees and expenses and any additional Trust Fund expenses relating to such Mortgage Loan; plus

(v) Liquidation Fees, if any, payable with respect to such Mortgage Loan (which will not include any Liquidation Fees if such repurchase occurs during the Initial Cure Period or, if applicable, prior to the expiration of the Extended Cure Period); plus

(vi) solely in the case of a repurchase or substitution by the related Mortgage Loan Seller, any Asset Representations Reviewer Asset Review Fee for such Mortgage Loan, to the extent not previously paid by the related Mortgage Loan Seller.

(PSA, §1.01.)

74. Accordingly, Plaintiff is entitled to payment of the Purchase Price, including without limitation the outstanding Loan balance, accrued and unpaid interest, Special Servicing Fees, legal fees and expenses related to the enforcement of the repurchase obligation, and Liquidation Fees.

### COUNT I: BREACH OF THE NO MATERIAL DAMAGE R&W

75. Plaintiff realleges and incorporates this Complaint's preceding paragraphs.

76. The MLPA and PSA constitute valid contracts supported by valuable consideration.

77. Seller breached the No Material Damage R&W with respect to the Loan, as set forth herein.

78. Seller's breach of the No Material Damage R&W had a material and adverse effect on the value of the Loan, the related Mortgaged Property, and/or the interests of the Trustee and

Certificateholders in the Loan and related Mortgaged Property, as set forth herein.

79. Seller has further breached its obligations under the PSA and MLPA by failing to pay the Purchase Price for the Loan, as specified in PSA §2.03(b) and MLPA §5.

80. By plain operation of the MLPA and PSA, Seller is obligated to repurchase the Loan at the Purchase Price.

81. As a direct and proximate result of this breach of warranty, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than the Purchase Price (including, *inter alia*, the amounts set forth above).

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment in its favor and against Seller as follows:

A. With respect to Count I:

    (1) enforcing the MLPA and PSA by requiring Seller to pay the Purchase Price for the Loan as specified in PSA §2.03(b) and MLPA §5;

    (2) awarding Plaintiff compensatory damages in an amount to be determined at trial but in excess of Seventy-Five Thousand Dollars ($75,000); and

    (3) awarding Plaintiff all pre-judgment and post-judgment interest at the maximum rate allowed by law;

B. Awarding Plaintiff its attorney fees and costs in this action as expressly provided in the PSA and MLPA; and

C. Awarding Plaintiff such other, further and different relief as the Court deems just and proper.

Dated: March 2, 2026					New York, New York

	JENNER & BLOCK LLP


	By: <u>/s/ Stephen L. Ascher</u>
		Stephen L. Ascher
		Jenner & Block LLP
		1155 Avenue of the Americas
		New York, NY 10036-2711
		SAscher@jenner.com

		Abraham M. Salander (*pro hac vice* pending)
		353 N. Clark Street
		Chicago, IL 60654-3456
		ASalander@jenner.com

		*Attorneys for Plaintiff*